[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Nature of Proceedings
On March 19, 1990, nearly two and a half years after their commitment to the Department of Children and Youth Services (DCYS) as neglected children, Tammy C., born December 29, 1974, and Christopher C., born April 29, 1977, CT Page 1747 became the subject of these petitions by which DCYS seeks to terminate the parental rights of their parents, Donald C. and Anne C. pursuant to Sec. 17-43a of the Conn. Gen. Stats. (Rev. 1989). Only abandonment was originally alleged as to the mother; as to the father, the petition alleged failure to rehabilitate and acts of commission or omission detrimental to their well-being. By amendment granted June 25, 1990, the petitioner has additionally pleaded, as to both parents, the absence of a parent-child relationship, as defined in subsection (f) of Sec. 17-43a, under circumstances that would make it detrimental to wait longer to reestablish such relationship.
At the initial hearing on April 17, 1990, personal service was confirmed on both parents: On Donald at Somers prison where he is serving a twenty-year sentence following his fourth conviction for child sexual abuse, and on Anne at her employment in East Hartford. The father appeared represented by counsel: counsel for the mother telephoned to inform the court of his inability to be present and of his client's desire to terminate her parental rights consensually. Pro forma denials to the alleged nonconsensual grounds were entered for both parents and the matter was continued to secure a psychological evaluation or parents, children and the relatives with whom they were living. Trial, originally scheduled for July, was twice continued, and after all parties rested on the second day of trial, November 9, 1990, they were given until December 7, 1990 for the submission of trial memoranda. The period of reserved decision thus commences on the latter date.
Facts
Evidence offered at trial, interpreted in the light of this court's record concerning these children, of which judicial notice is taken, supports the finding of the following facts:
Tammy and Christopher are the oldest and youngest of three children born to Donald and Anne C. following their marriage in 1973. Their middle child, Donald, Jr., is not a subject of these petitions for termination of parental rights.
Both parents reported having suffered emotional neglect and sexual abuse at the hands of relatives during their respective childhoods. Donald's first arrest for sexually molesting young children occurred before the birth of Tammy, their first child, on December 15, 1974. He was placed on probation following conviction and remained in the family home during the birth of Donald, Jr. on May 9, 1976 and Christopher on April 19, 1977. His second arrest for child sexual CT Page 1748 molestation occurred in 1978 and again he received a suspended sentence and remained with his family. In 1982, following his third conviction, he was sentenced to eight years, suspended after four.
Although she had spoken of divorcing her husband from the time of his second conviction, Anne did not do so, nor did she impede his return to the family in 1986 following his first imprisonment or his introduction to the family of another convicted pedophile whom he had met when in prison. In the year after his return home, his children were repeatedly left alone with this friend, even after Donald, Jr. and Christopher disclosed to both parents, on a number of occasions, that he had sexually molested them many times. Tammy did not report sexual abuse, but she, like her brothers, later disclosed being physically abused with belts and an electric cord by both parents, as well as being chronically emotionally neglected by their mother. (Study submitted at time of commitment, October 6, 1987).
On June 6, 1987, Donald, Sr. was arrested for, and subsequently convicted of, sexual assault in the second degree on a 10-year old visiting friend of his two sons, and for risk of injury to minors because of doing so in the presence of his own children.
The children were taken by DCYS under an Order of Temporary Custody (O.T.C) and placed with a paternal aunt and her husband, Bonnie and Albert S. Petitions alleging neglect were filed, the O.T.C confirmed by agreement, and a psychological evaluation conducted. On October 6, 1987, with the advice of their attorney, the parents both entered pleas of nolo contendere to allegations of neglect based upon the children's witnessing of their father's sexual assault on their 10-year old friend and the failure of both parents to protect them from the repeated sexual abuse by the father's friend. Visiting by the father ceased on January 22, 1988 when he was sentenced to 20 years, suspended after eight. There have been no further visits since that date.
The children's initial placement in June of 1987 had been with Aunt Bonnie and her husband. Five months after commitment, in March of 1988, Bonnie requested removal of the boys because of their behavior in response to the stresses caused by their father's sexual offenses, his criminal conviction and incarceration, and their total abandonment by their mother. The boys were placed together in an unrelated foster home but continued to visit their aunt and sister. Christopher was returned to Aunt Bonnie in January of 1989 at his insistence, leaving Donald, Jr., whose feelings for their CT Page 1749 father were less rejecting, alone in the second foster home. Pursuant to subsection (e) of Sec. 46b-129, the initial 18-month commitment was extended once on March 7, 1989 (effective April 6, 1989) with the agreement of both parents, and again during the pendency of this proceeding (effective October 6, 1990) with the agreement of the father and by default of the mother. The latter extension was granted for the full 18 months as to all three children, without prejudice to the pending termination action regarding Tammy and Christopher or to any unextinguished rights of the parents as to all three of the children.
In the 30 months between the commitment of the children on October 6, 1987 and the adjudicatory date for these petitions (June 25, 1990), Anne C. has not once visited her children. When they telephoned her soon after the issuance of the O.T.C., she had hung up on them. In March of 1988 she telephoned DCYS to say that she was then contemplating a new marriage and wanted to start working on the return of her children. The social worker informed her of the first steps to take toward achieving this objective but she took none of them. (State's Exh. B., p. 2). Later, in January of 1989, she informed DCYS that she did not want to receive any further correspondence regarding the children. (Id., p. 3) When she appeared, with counsel, in court on March 7, 1989 and agreed to the extension of commitment, she also disclosed her intent to terminate her parental rights but subsequently took no steps toward this end. (Id.) Donald, Sr. pursued his visitation rights both before and after the start of his present sentence on January 22, 1988. No visits took place in prison with these two children, however, because of their expressed aversion to seeing him, and their chagrin at the nature of his repeated offenses, of which their peers were well-aware. Letters written by Donald to these children only induced guilt feelings in them, to their great distress. Tammy eventually refused to read any more of his letters or accept gifts offered in his name, clearly expressing her desire never to see him again. Christopher accepted a Christmas gift from him in 1989 but continued to reject any personal contact with him.
After being removed from their parents' home, Tammy and Christopher both revealed that they had been sexually molested by their father in the past, (Id., p. 8-10) and both children expressed the certainty that, provided with the opportunity, their father would sexually molest them again in the future. Testifying for herself, Tammy stated she would feel "disappointed" and "angry" if her parents' rights were not terminated. She said she no longer hates her father for treating his children "like possessions", but neither does she like him. At the same time, she said she "loved" her parents CT Page 1750 but "didn't like their actions." Christopher did not testify, but testimony of other witnesses established that there had been a contest for his allegiance between warring members of the father's family. After nine months placement with his older brother in the unrelated foster home, where he had had contact with other paternal relatives hostile to Aunt Bonnie, he had insisted on returning to her home, where Tammy had remained in March 1989. While at first suffering from low self-esteem, friendless, and unable to concentrate because of preoccupation with his early experiences, Christopher now is doing well in school, has many friends, and is making progress in therapy. (Testimony of Aunt Bonnie, November 9, 1990.) No evidence was offered on behalf of either parent.
Clinical Evidence
Prior to the commitment of the children in 1987, the family was evaluated by a clinical psychologist, Dr. Kevin Connolly. All three children had revealed feelings rejection by a mother who drank chronically, was unavailable to them when they lived with her and had abandoned them after their placement. They appeared to have somewhat warmer feelings for their father despite knowledge of his repeated convictions for child sexual abuse. Both Christopher and his brother told the evacuator that their father had sexually abused them years earlier and both parents revealed having been sexually abused by their own relatives as children. Dr. Connolly found all members of the family to be depressed, withdrawn, and manifesting signs of years of dysfunction since earliest childhood. He concluded that it seemed doubtful ". . . that any of the C. children will ever be able to trust their parents enough to feel safe in their care ever again, " (Report of Dr. Connolly, neglect record, October 6, 1987 p. 8), and predicted for Donald, Sr. ". . . a lifetime battle trying to control his inappropriate sexual impulses."
Almost three years later, clinical psychologist Dr. Bruce Freedman evaluated the two children, the relatives with whom they were living, and the father. Anne neither attended nor called to cancel appointments made for her with Dr. Freedman. Both children recalled their life with their parents as being wholly negative, with a drunken mother who was indifferent and neglectful, and a father who angered and disgusted them. To Dr. Freedman the father admitted molesting his two sons when they were younger: "I just did it a lot out of habit." (State's Exh. A, p. 11). He had attended the sex offenders' program in Somers during his first incarceration, but because he had recidivated nonetheless, he refused to re-enter the program when convicted in 1988: ". . . it didn't work, I have to find the cure in myself, the control CT Page 1751 didn't work." (Id.) Dr. Freedman concluded that Donald C. ". . . showed little evidence of true concern for his children, little understanding of his own pedophilia, and little evidence of rehabilitation or prospects for future rehabilitation," (Id., p. 12-31) sufficient to make him "even a safe visiting parent." Based upon his interviews, conducted over a period of three days in May of 1990, Dr. Freedman concluded:
 Donald C. is a chronic pedophile who neglected and abused his own children. He failed to establish the basic elements of good parental relationship with his children, including affection, guidance, encouragement of independence and encouragement of healthy development. He used his own children as sexual objects, and allowed other disturbed adults access to his children as sexual objects as well. He exposed the children to many horrifying experiences, frightening them, destroying their trust in adults, disturbing their view of other people, of sex, of life, and of basic relationships. The children's feelings or him are a combination of disgust, pity, and hatred. There seemed little if any relationship between Donald C. and Chris or Tammy worth preserving. (Id., p. 13).
While he endorsed the "excellent care provided by the aunt and uncle, he could understand their reluctance to adopt the children in face of death threats, expressed to them through another paternal aunt, by the father, ". . . a man who is familiar with firearms, has shown little impulse control in the past, and who has threatened their lives if they adopt these children." (Id.) Apart from the possible jeopardy to the lives of the aunt and uncle, Dr. Freedman found that "termination . . . is certainly justified and would accomplish both goals" he found to be "the most important principles guiding any action": Namely, the goal of "preserving the integrity of . . . [their] custody of Tammy and Christopher" and that of "completely preventing access to these children by Donald C." (Id.)
In his testimony of November 6, 1990, Dr. Freedman found no relationship existed between either child and either parent. What past hopes had existed for contact with their mother had ceased with her prolonged absence from their lives. Their original fear of their father has been replaced with relief at no longer having to have contact with him: "I don't think there is any potential for future relationship with either parent." Dr. Freedman found the father's lack of insight and understanding of the psychological damage suffered by his children to be "very striking" with a "negligible" chance that CT Page 1752 this would change. Both children now regarded Aunt Bonnie and her husband as their psychological parents, and the psychologist recommended that they remain there until adulthood with no contact with their father unless specifically sought by the children. Terming Donald, Sr. a "chronic pedophile", he predicted that without treatment, he "will be dangerous to be around children," and even the attempt to expand visitation or regain custody — even if unsuccessful — would make the children "extremely frightened." He could find no benefit to either child from the continued existence of the residual parent rights, and recommended termination of the parents' rights as therapeutically beneficial to the children, whether or not there were to be an adoption.
Psychiatric social worker Richard Englehardt, who had supervised Christopher's therapist when placed with his brother in the unrelated foster home and who had had Donald, Jr. in counselling until shortly before testifying, also saw no advantage to the children from a rekindled relationship with their father. Mr. Englehardt referred to sexually abusive behavior as an "addiction" in the father's extended family from which recovery cannot even begin without long-term, sustained, intensive (three or four times a week) therapy. After witnessing a single visit in prison between the father and Donald, Jr., which he found to be an "extremely toxic" and negative experience for the child, Mr. Englehardt concluded it would be a "bad idea" for the children subject of this petition to have contact with him and recommended terminating parental rights so Tammy and Christopher could experience "closure" of their relationship with the parents.
Adjudication — on facts as of the date the petition was amended, June 25, 1990.
Mother: Anne C, has made no effort to see, and has affirmatively avoided contact with, Tammy and Christopher since their placement in 1987. This finding alone provides clear and convincing proof of both grounds pleaded for terminating her parental rights: Abandonment, not only in the statutory sense of a failure "to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child", but also in the common law sense of a complete and intentional relinquishment of all contact with the child. Whatever relationship may have existed between the children and their mother before their placement in 1987, the passage of three years without a single personal contact, against a memory of a mother who rejected them emotionally and failed to protect them from abuse by their father and his friends, supports by clear and convincing evidence the conclusion that it cannot now be a "relationship that ordinarily develops as a result of a parent CT Page 1753 having met on a day to day basis the physical, emotional, moral and educational needs of the child." Further, given the mother's desire, expressed to her attorney and the DCYS social worker in the past, to have nothing further to do with these children and to receive no further communications regarding them, as well as her total absence from these proceedings, it is equally clear that "to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interests of the `children.'" This conclusion is supported by the testimony of Dr. Freedman who saw no advantage to either child from a continuing legal tie with either parent.
Although not pleaded, this evidence would also provide clear and convincing proof of a third ground to terminate the mother's parental rights: Failure to rehabilitate. In 1987 she was found to have neglected her children and given a written list of expectations leading to possible reunification with them. These included cooperation with DCYS, visiting as often as permitted, and entering whatever counselling was recommended by Dr. Connolly. She did none of these. She was, in 1990, no nearer to making a safe and secure home for these children than she was when they were committed in 1987. In fact, by expressing her intention of disengaging from their lives, she was farther from being able to care for them than when they were removed. The petitioner has thus provided clear and convincing proof of three statutory grounds for terminating the parental rights of Anne C. in both of these children.
Father: Had DCYS filed coterminous petitions seeking to terminate the parents' rights at the time it filed neglect petitions in 1987, it could well have been found that Donald, Sr.'s sexual behavior toward his own and other children, as well as his failure to protect them from sexual abuse by his friend, would have supported termination of his parental rights under the second nonconsensual ground set forth in subsection (f) of Sec. 45-61f applicable to children not previously committed to DCYS. These acts, or failures to act, however, were the basis of a neglect petitions only, and upon adjudication of neglect the children had been committed to DCYS, leaving Donald with residual parental rights. He was encouraged to visit as much as permitted and to enter counselling for the problem which had caused the disruption of his family. While a termination proceeding is a different form of action, brought under a different statute with different standards of proof, it is suggestive of double jeopardy to employ the same facts pleaded in 1987 to secure the children's commitment as the basis for terminating residual parental rights three years later. Since June of 1987, the father has had no legal responsibility for providing care for his CT Page 1754 children, and the petitioner has offered no evidence that since their initial placement on June 11, 1987 either "child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being." This ground is, therefore, dismissed.
The record does support, by the requisite clear and convincing proof, however, the other two grounds pleaded for terminating the father's parental rights: By refusing to re-enter the program at Somers for sex offenders, he has turned his back on the only counselling available to him during his incarceration. While he makes no attempt to hide his sexual abuse of young boys on a continuing basis for more than a decade, he is doing nothing in an attempt to change this well-established pattern and thus to remove himself as a threat to the safety of his own or other children. This fact alone constitutes clear and convincing proof of a failure ". . . to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, . . . [he] could assume a responsible position in the life of the" children. Had he engaged in such therapy, given the long duration of his problem and its origins in a family deeply embedded for three generations in child sexual abuse, it is not certain that he would have achieved in two years the requisite degree of personal rehabilitation sufficient to defeat the establishment of this ground, but the burden of proof would have weighed more heavily on the petitioner than it did in this record.
While Tammy may have used the word "love" in describing her feelings for her parents, and Christopher was sufficiently interested in a Christmas gift sent by his father in 1989 to permit its delivery to him (which Tammy refused), it would strain the plain meaning of "parent-child" relationship, as that term is defined in the statute, to say that what relationship exists between this father and these children is the kind of
 . . . relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child. . . . [Emphasis added].
Judicial interpretation has imposed on this language an additional requirement: that a child have no "present memories or feelings" for the parent, and ". . . at least some aspects of these memories and feelings are positive." CT Page 1755
In re Jessica M., 217 Conn. 459, 475 (February 12, 1991). The origin of the requirement that the child have no "present memories or feelings" for the parent in order for this ground to exist is found in In re Juvenile Appeal (Anonymous),177 Conn. 648 (1979). Despite its absence in the statutory language, the court found that whether a child never knew his parents, or had lost a relationship with them that had once existed, "In either case the ultimate question is whether the child has no present memories or feelings for the natural parent." (Id. at 670). This language was later used by a father who had stabbed his wife and one child to death in the presence of other children and whose parental rights were therefore terminated. These children had vivid memories and feelings about their father who argued that, therefore, this ground was not available to terminate his parental rights. In rejecting this argument, the Appellate Court stated:
 Both the statute and its subsequent judicial gloss must be read so as to make common sense and so as not to lead to a bizarre result.
Interpreting feelings "for" as "feelings of a positive nature", the court eliminated from the "judicial gloss" "the extreme, psychologically corrosive and destructive feelings which are evident in this situation." In Re Juvenile Appeal (84-6),2 Conn. App. 705, 709 (1984).
 Somewhere a line must be drawn between a relationship which is "troubled and confused" [citing 177 Conn. at 670] and one in which a parent by his own act has caused the destruction of a family. In striking at the heart of the family, the respondent demonstrates total disregard for the impact of his actions upon the emotional well-being of these children. The legacy of this disregard will live with them for many years to come. (2 Conn. App. 705, 7.2).
Three years later the Appellate Court found reversible error where a trial court had held that the existence of negative feelings for a parent precluded the establishment of this ground for terminating the parental rights of that parent. In Re Rayna N., 13 Conn. App. 23, 35 (1987). Even memories that are not clearly negative but are only vague and "nonspecific" have been held insufficient to preclude the finding of this statutory ground for termination. In Re James T., 9 Conn. App. 608,616 (1987). In the present case, there is no question that both Tammy and Christopher have vivid memories of life with both their parent where: sexual abuse by the father preexisted the birth of the children; his own sons were CT Page 1756 abused, and Tammy fondled, by the father when young children; friends of his sons were sexually abused by the father in the presence of the sons; a convicted pedophile was permitted to spend time alone with the children, even after the parents were told of his sexual molestation of them; the mother — perhaps because of substance abuse — was incapable of protecting the children from the direct and indirect abuse of the children and held herself aloof from them emotionally; the father used harsh discipline and treated his children like "possessions", according to his own daughter. The "present memories and feelings" of that life have caused them, from their newfound stability with their aunt and uncle, to wish an end to the legal tie with their parents so that they need never fear even an attempt to dislodge them from that present home or to force the renewal of face-to-face contact. The children are old enough to be able to look up their parents if and when they should ever choose to do so; they are not old enough to feel secure without the knowledge that the legal tie with their biological parents is ended. The petitioner has thus established by clear and convincing proof that there exists between these children and their father no parent-child relationship as defined by law and interpreted by the Supreme Court. Further, it is even more clear that considering the father's long sentence, his refusal to enter treatment for sex offenders, and the children's aversion to his letters or visits, that ". . . to allow further time for the . . . reestablishment of such parent-child relationship would be detrimental to the best interest of the child[ren]." The testimony of Dr. Freedman was unequivocal as to this conclusion from a clinical point of view. His only caveat was on the possible adoption of the children by their present caretakers in view of the father's threat to kill them if they should try to do so, and Dr. Freedman's estimate that he was capable of carrying out such threat.
The petitioner has thus established by clear and convincing evidence two of the nonconsensual grounds pleaded for terminating the parental rights of Donald, Sr.
Disposition — as of final day of hearing (November 6, 1990)
Nothing changed with regard to either parent between the original filing date of this petition (March 19, 1990) and the final date of hearing eight months later. The father remains incarcerated, uninvolved in the sex offender program at Somers Prison. The mother remains aloof from the proceedings, uninvolved with the children. The children continue doing well with the aunt and uncle with whom they live and with whom they clearly choose to remain living. CT Page 1757
Before an order terminating parental rights may issue, the court must consider the six factors set forth in subsection (d) of Sec. 17-43a:
(1) No services could be offered to a parent like Anne who refuses to visit her children and displays no motivation to resume their care. The father was urged to re-enter the program for sex offenders at Somers during his current incarceration. Visitation was requested at the prison by the father, but was refused by the children. Not forcing them to visit the father, under these circumstances, cannot be deemed unreasonable, particularly since the visit with a third child who was far more sympathetic to his father than Tammy or Christopher was described by that child's therapist as "toxic" for him.
(2) While not an order, the court spelled out its expectations at the time of commitment. The father has visited as often as permitted, which in this case was not at all. He has not engaged in any kind of therapy for the presenting problem in this case. The mother has neither visited nor engaged in counselling.
(3) This case was brought to court not to secure a placement in adoption — the placement of these children with their aunt and uncle can be made secure without adoption — but in deference to the "feelings and emotional ties of the child[ren] with respect to . . . [their] parents . . . and any person who has exercised physical care, custody or control . . . for at least one year and with whom the child[ren] has developed significant emotional ties." Mr. Englehardt described the need for "closure" of the children's relationship with these parents; Dr. Freedman found no benefit to the continuation of the legal tie with either parent and a clear benefit from the assurance that the tie is permanently severed.
(4) The children, both teenagers, can articulate as well as act out their feelings for their parents and for their present caretakers. The contrast between their condition in 1987, when evaluated by Dr. Connolly, and three years later when evaluated by Dr. Freedman, is marked. At this last stage of their childhoods, they should not be asked to relinquish the safety and nurture of their present home; they should not have to even contemplate the possible resumption of care by either parent
(5) Neither parent has made any effort to adjust their circumstances, conduct or conditions to make it in the best interest of the children to return them to the home of either parent in the forseeable future. Anne has made no effort to contact the children or their caretakers; Donald, Sr. has been CT Page 1758 prevented from maintaining a relationship because of his incarceration following conviction for sexual assault on a child and because his requests for visits at Somers were denied by DCYS in deference to the feelings of the children. Under the circumstances, these are not "unreasonable acts."
Having considered the foregoing, it is found by clear and convincing proof to be in the best interest of these children for their parents' rights to be terminated so that they may know the security of a permanent home without risk of return to the tragic circumstances that led to their removal from their parents' home three years ago. Therefore, it is ORDERED that the parental rights of Anne C. and Donald C., Sr. in and to the children Tammy C. and Christopher C. be, and hereby are terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of securing a permanent home for them, either through adoption or in permanent foster care and that the said Commissioner submit to this court within 90 days of the date of this judgment a written report as to the progress toward such a permanent plan. If the children are not adopted by June 1, 1992, the said Commissioner is further ORDERED to submit a Motion For Review of Terminated Child for each child by that date to be in conformity with Federal law.
Appeal
The parents have 20 days from the date of this judgment in which to take an appeal. If they decide to pursue an appeal and their counsel at trial is willing to represent them in it, this court will appoint him to act as appellate counsel at public expense until all appellate process is completed. If, however, in the exercise of his professional judgment as an officer of the Superior Court, he declines to perfect such appeal because, in his opinion, it lacks merit, he is not required to do so but may instead simultaneously file a timely motion to withdraw and another motion to extend the appellate period to the full maximum of 40 days as permitted by law. Such motions, if unopposed, will be granted ex parte and a new attorney appointed to review this record and make an independent determination of the merits of such appeal. If the second attorney determines it lacks merit, he or she is required promptly to submit to the court in writing the reasons for this opinion. The parents will then be informed by the court clerk that they have the balance of the 40 days in which to secure their own counsel for the purpose of taking such appeal, who may, if qualified, be appointed by the court to be compensated by the state. This procedure conforms to the principles of Douglas v. California, 372 U.S. 353 (1963), adopted for Connecticut in Fredericks v. Reincke, 152 Conn. 501
CT Page 1759 (1965), in which it was held to satisfy an indigent criminal defendant's constitutional right to counsel on appeal if, after the public defender at trial notifies both client and court that "he could not conscientiously proceed with the appeal, " another attorney is appointed to consider the merits of the appeal and comes to the same conclusion. Even a convicted criminal defendant "cannot demand that the trial court find and appoint other counsel who will advise such appeal" after the second public defender has declined to do so. Fredericks v. Reincke, 152 Conn. at 505. If such procedure satisfies the sixth amendment right to counsel where the only conflicting interests are those of a defendant who seeks review of his conviction and of the state which has a legitimate interest in avoiding the expense and judicial burden of meritless appeals, it is a fortiori appropriate where there are interests of third parties involved: those of the child whose interest in achieving permanent nurturing parents is entitled to at least as great a degree of consideration as those of his parent whose right to raise him, brought into question because of past acts omission, is at issue. Even an unsuccessful appeal could delay permanent planning for these children for years since no child may be adopted until the appellate process is exhausted and the termination order final.
If an appeal should be taken, the judgment of termination shall be stayed during its pendency, but throughout this period all decisions made by DCYS, as the children's continuing legal guardian, as to contacts with his natural parents shall be based solely upon the children's best interests, not upon the parents or the lingering possibility of an eventual reunification. Whatever obligation is imposed upon DCYS by federal and state law to make continuing efforts to reunite committed children with natural parents ends upon a judicial finding that grounds exist to terminate parental rights.
Entered at Hartford this 20th day of February, 1991.
BRENNEMAN, J.